IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

PATTON V. ROBARGE CONSTR. CO.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CHRISTOPHER PATTON, APPELLANT,
V.
ROBARGE CONSTRUCTION COMPANY, APPELLEE.

Filed January 28, 2014.    No. A-12-710.

Appeal from the Workers' Compensation Court: JAMES R. COE, Judge. Reversed and remanded with directions.

Michael P. Dowd, of Dowd, Howard & Corrigan, L.L.C., for appellant.

Jon S. Reid, of Lamson, Dugan & Murray, L.L.P., for appellee.

INBODY, Chief Judge, and IRWIN and MOORE, Judges.

MOORE, Judge.

## INTRODUCTION

Christopher Patton appeals from the award of benefits entered by the Nebraska Workers' Compensation Court against Robarge Construction Company (Robarge). Because we find that the trial court erred in failing to award Patton additional benefits for loss of earning capacity, we reverse, and remand with directions to determine Patton's current loss of earning capacity and award additional benefits therefor.

## BACKGROUND

Patton was injured on April 2, 2004, while working for Robarge as a framer, when he fell several feet through a drywall ceiling to the floor, landing on his back. Patton was taken to a hospital and was subsequently treated for a fractured left ulnar bone and for a nondisplaced "burst compression" fracture of the L1 vertebrae and "transverse process" fractures at L2 and L3. Dr. Timothy Burd treated Patton for the compression fracture and placed him in a back brace while it healed. Patton's left arm fracture healed without any evidence of permanent impairment.

- 1 -

Patton was released from Burd's care on September 14, 2004, but he returned to Burd in December, requesting more pain medication due to increased back pain. Burd diagnosed Patton with myofascial strain due to physical deconditioning of the spine and recommended physical therapy and work restrictions. On July 27, 2005, Burd found that Patton had reached maximum medical improvement and recommended a functional capacity evaluation (FCE).

The FCE was performed in August 2005. The FCE showed that Patton could lift and carry 65 pounds occasionally and 35 pounds frequently, and that he was able to work in a medium to medium-heavy work capacity with limited prolonged forward bending. On September 19, Burd again found that Patton was at maximum medical improvement and found that he had incurred an 8-percent permanent impairment to the body as a whole as a result of the compression fracture. Burd agreed with the findings and restrictions set forth in the FCE.

Patton continued to complain of back pain and came under the care of Dr. Alan Jensen in March 2005 and was still treating with Jensen at the time of trial.

The parties agreed upon Gloria Bennett as the vocational rehabilitation expert to provide a loss of earning capacity evaluation. In the evaluation dated December 8, 2005, Bennett found that Patton had a 30-percent loss of earning capacity. Based on Bennett's loss of earning capacity determination, Robarge voluntarily paid Patton over 300 weeks of indemnity benefits, which were accepted by Patton.

The parties also agreed to a vocational rehabilitation plan, and Patton enrolled in a community college, seeking an associate degree in applied science in construction technology. His plan was canceled on January 11, 2007, because of his failure to comply with the requirements of the plan.

Patton suffered increased back pain symptoms in November 2010, and Jensen took him off work from November 5 through November 22 and again from November 30, 2010, through June 1, 2011. In a supplemental report dated December 7, 2010, Jensen opined that Patton's April 2004 accident had been the cause or a major cause of the back pain and other symptoms Patton had experienced since the accident. Jensen indicated these symptoms have resulted in the medical need for examinations and treatment that Jensen provided to Patton and the gradual progression/deterioration of Patton's back-related medical condition and symptoms. He opined that the work Patton did for employers other than Robarge following his injury had not caused any temporary or permanent damage that was substantially contributing to Patton's disability and/or symptoms.

Dr. Dean Wampler conducted an independent medical examination of Patton on February 11, 2011. Wampler opined that Patton's current low-back pain and radiating symptoms in the left leg were attributable to advancing degenerative disk disease, exacerbated by his smoking, and were not related to his accident in 2004. Wampler based his opinion on Patton's lack of low-back pain and radiating symptoms shortly after the accident. In a supplemental report dated May 9, 2012, Wampler opined that some of Patton's work activities after 2006 had aggravated or promoted his underlying and preexisting degenerative spine disease. Jensen provided medical opinions contradicting those expressed by Wampler and attributing Patton's low-back pain to the April 2004 accident.

In a letter to Patton's attorney dated August 3, 2011, Jensen provided a summary of changes he had made to Patton's restrictions since his November 2010 increase in symptoms.

Jensen indicated that on June 29, 2011, Patton was advanced to the light physical demand level but that his nonmaterial handling activities were decreased to occasional partial bending and squatting. On April 30, 2012, Jensen assigned permanent restrictions as a result of Patton's work-related injury. Jensen found that Patton could occasionally lift 20 pounds, lift from below the knees, push/pull 30 pounds, bend/twist, squat/kneel/crawl, work above shoulder height, and engage in repetitive use of the back. Patton could also engage in frequent climbing of ladders or stairs.

On May 7, 2012, vocational rehabilitation expert Jane Yaffe-Rowell provided a supplemental opinion regarding Patton's loss of earning capacity. Yaffe-Rowell replaced the previous expert, Bennett, who had retired. Based on the restrictions assigned by Jensen in August 2011, Yaffe-Rowell found that Patton had sustained a 50-percent loss of earning capacity. After she was provided with additional information, including the permanent restrictions outlined by Jensen in April 2012, Yaffe-Rowell subsequently opined that Patton had a 60-percent loss of earning capacity.

Patton filed a petition in the compensation court on September 30, 2011, and trial was held on May 18, 2012. The parties stipulated that a recognized accident happened on April 2, 2004; that Patton's average weekly wage was $560; and that Robarge had paid 300 weeks of indemnity benefits prior to trial and all medical bills except those listed in a particular exhibit.

In his trial testimony, Patton disagreed with Wampler's suggestion that he had not experienced low-back pain shortly after his accident. According to Patton, he was tested for low-back pain on the first day he was hospitalized and it was something he expressed concern about to the first doctors that treated him after the accident. Patton felt that the restrictions identified in the August 2005 FCE were unrealistic based upon his life experiences since that time. Patton was unable to return to work which would require lifting 30 to 65 pounds through the day, because that amount of weight was too much for him to tolerate. Since the accident, Patton's condition has waxed and waned based on his level of physical activity. Since the accident, Patton has worked at a variety of mostly manual labor jobs and has found that jobs requiring him to attempt lifting 30 to 60 pounds have led to a spike in his low-back pain.

The compensation court entered an award on July 6, 2012. The court accepted Jensen's opinions and found that Patton's current symptoms were a result of a progression of his April 2004 injury. The court declined to award Patton any increase in the amount or rate of percentage of loss of earning capacity due to the fact that Robarge had already paid 300 weeks of indemnity payments for the loss of earning capacity at the rate of 30 percent based upon Bennett's December 2005 report. Pursuant to Neb. Rev. Stat. § 48-121(2) (Reissue 2010), the court found that it had no statutory authority to extend an award of loss of earning capacity beyond 300 weeks, which payments concluded on December 31, 2009. Patton subsequently perfected his appeal to this court.

## ASSIGNMENTS OF ERROR

Patton asserts, consolidated and restated, that the compensation court erred in failing to find that he was entitled to a loss of earning capacity award at the rate of 50 to 60 percent.

## STANDARD OF REVIEW

A judgment, order, or award of the Workers' Compensation Court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Visoso v. Cargill Meat Solutions*, 285 Neb. 272, 826 N.W.2d 845 (2013).

A determination as to an injured worker's loss of earning capacity is a question of fact to be determined by the Workers' Compensation Court. *Ladd v. Complete Concrete*, 13 Neb. App. 200, 690 N.W.2d 416 (2004).

## ANALYSIS

Patton asserts that the compensation court erred in failing to find that he was entitled to a loss of earning capacity award at the rate of 50 to 60 percent. Patton argues that his loss of earning capacity has not been litigated, that Yaffe-Rowell's opinion that he suffered a loss of earning capacity between 50 and 60 percent should be entitled to a rebuttable presumption of correctness under Neb. Rev. Stat. § 48-162.01 (Reissue 2010), and that he should benefit from this increased loss in earning capacity and not be penalized for Robarge's voluntary payment of 300 weeks at 30 percent. Patton essentially argues that the court erred by failing to fully compensate him for his April 2004 injury.

Robarge argues that the compensation court does not have the statutory authority to award additional payments for loss of earning capacity, because § 48-121(2) limits disability payments to 300 weeks. Robarge observes that as a statutorily created court, the Workers' Compensation Court is a tribunal of limited and special jurisdiction and has only such authority as has been conferred on it by statute. *Stueve v. Valmont Indus.*, 277 Neb. 292, 761 N.W.2d 544 (2009).

Robarge also argues that Patton voluntarily accepted the 300 weeks of payment and cannot now negate his agreement because of greater incapacity. In support of this argument, Robarge cites Neb. Rev. Stat. § 48-111 (Reissue 2010), which provides:

> Such agreement or the election provided for in section 48-112 shall be a surrender by the parties thereto of their rights to any other method, form, or amount of compensation or determination thereof than as provided in the Nebraska Workers' Compensation Act, and an acceptance of all the provisions of such act, and shall bind the employee . . . .

Neb. Rev. Stat. § 48-112 (Reissue 2010) provides, "In the occupations described in section 48-106, all contracts of employment shall be presumed to have been made with reference and subject to the Nebraska Workers' Compensation Act. Every such employer and every employee is presumed to accept and come under such sections." Together with Neb. Rev. Stat. § 48-148 (Reissue 2010), these are the exclusivity provisions of the act. See *Pittman v. Western Engineering Co.*, 283 Neb. 913, 813 N.W.2d 487 (2012). The import of these sections is that employees covered by the act cannot maintain a separate suit against an employer for an injury which incurred on the job, because the act is the exclusive remedy of the injured employee.

While we agree with Robarge that the language of § 48-111 binds Patton to only what is provided for under the act, we disagree that Patton's receipt of voluntary payments computed at a 30-percent loss of earning capacity precludes him from seeking additional benefits based upon the subsequent increased loss of earning capacity determination.

This case involves an original application for compensation benefits and an original award of such benefits. Although Robarge made voluntary partial disability payments beginning in 2006, the workers' compensation court was not asked to determine Robarge's actual liability to Patton for partial disability benefits as a result of the 2004 injury and the 2010 progression of the 2004 injury until Patton filed this action in 2011. Thus, the partial disability benefits which Robarge previously paid to Patton were not made pursuant to any judicial determination of its liability. Further, the record does not contain any settlement agreement in writing, nor was any agreement submitted and approved by, or release filed with, the Workers' Compensation Court.

Because there had been no prior award of benefits and no settlement, any payment Robarge made prior to the entry of the 2012 award was simply an estimate of its liability. Patton did not become legally bound by that estimate simply by accepting the payments. There was no award of permanent partial disability until the compensation court entered the award in 2012.

We conclude that the compensation court erred in finding that it was precluded from awarding additional benefits based upon the current loss of earning capacity determination by the court-appointed vocational counselor. Because the trial court's award was the initial judicial determination of Patton's entitlement to compensation benefits, the partial disability payments which Robarge previously made were simply voluntary payments based upon an earlier loss of earning power determination.

The compensation court accepted Jensen's opinions and found that Patton's current symptoms were a result of a progression of his April 2004 injury. Although the trial court noted the finding of the current court-appointed vocational rehabilitation expert that Patton had an increased loss of earning capacity of between 50 to 60 percent, it did not make a specific determination of the current loss of earning capacity; rather, it declined to award any increase in the percentage of loss of earning capacity because Robarge had already paid for loss of earning capacity for 300 weeks. Because this was error, we reverse the judgment and remand the cause to the trial court for a specific determination of the current loss of capacity and calculation of any additional benefits for such loss of earning capacity.

### CONCLUSION

Patton is not precluded from seeking an award of benefits for loss of earning capacity due to the previous voluntary payment of benefits by Robarge. The decision of the Workers' Compensation Court is reversed, and the cause is remanded for a determination of Patton's current loss of earning capacity on the record previously made and for an award of benefits in accordance with his loss of earning capacity.

REVERSED AND REMANDED WITH DIRECTIONS.